We have three argued cases this morning. The first is 15-1681 Parallel Networks v. Kayak Software Corporation. Mr. Craddock. Your Honor, Tim Craddock, present and ready, Your Honor. Yes, go ahead. May it please the Court. My name is Tim Craddock. I'm here representing Parallel Networks, LLC in this case. Parallel is asking this Court to reverse and remand the District Court's grant of summary judgment of non-infringement in favor of cross-appellants Kayak Software Corporation, DBA, Kayak.com, the Orbitz entities, and Wolverine Worldwide, Inc., and remand this case to the District Court for further proceedings. Parallel is making this request for the following three reasons. First, the District Court erred in its infringement analysis of the executable applet limitation as to the Kayak, Orbitz, and Wolverine applets. Second, the District Court erred in categorizing the Kayak applet as a Group B applet rather than a Group A applet. Had it properly categorized the Kayak applet, it would have not granted summary judgment in Kayak's favor. Third, there are competing expert declarations in this case that render summary judgment inappropriate because they create a genuine issue of material fact. Turning to Parallel's first point, a reasonable juror could have found in Parallel's favor on the issue of whether these applets infringe the executable applet limitation based on the evidence presented by Parallel, including... They do that under the claim construction in our earlier opinion. Yes, Your Honor. The District Court construed the executable applet term to mean program code that can be used by a client device. And this court clarified that executable means capable of being executed, that is, capable of being put into effect and carried out fully and completely. Is that the full construction that this court gave in the 2013 opinion of this court? Yes, Your Honor. That is the full construction of executable applet is understood by Parallel and is applied by the District Court in this case. I thought it was something about is the applet executable at the time that it is generated and then transmitted over to the client? And then so you have to look at what is generated by the server and test whether that has all the data and functionality that's required in order for it to execute. Certainly, Your Honor. To put that in context... Am I wrong in my understanding of what the claim construction is? I believe that that is not what the claim construction was or that that is the claim construction that was applied by the District Court in this case. Aren't you ignoring the language of the opinion? It says generating the applet in turn requires that both the particularized data and the data manipulation system reside in the transmitted applet and that it has to be there in the applet when it's transmitted. So to review the court's prior opinion in context, it's probably worth talking about the applets that were issued in that case. For example, GAP was in that case and they had an applet that was identified and actually in the middle of the applet there was a call to this function called the load product data function. I understand that contention, but I don't see how we can limit our earlier opinion to the facts of the case. I'm not asking this court to limit its opinion to the facts of the earlier case. I'm just trying to put the statements that were made in that case in context. I believe that in that case, as understood by Parallel and frankly as understood by the District Court in denying summary judgment to the Group A applets, that the extra transmission in that case was evidence that the applets in that case did not contain both the requisite functionality and data but was never itself actually the issue. So if you take the Wolverine applet, for example, in this case, and it's on appendix page 3216, or if you'll turn to appellant's brief page 50 if that's easier, you can actually see a picture of what it looks like. Here in this case, as Mr. Denning explained, when you went to the Wolverine website, you would download HTML. That HTML would be parsed, compiled, and put into the browser's memory line by line. As acknowledged by the District Court, that HTML file could contain different applets. The question is, when we're asking whether the applet that's identified is program code that can be used by the client device, that is, is it capable of being put into effect and carried out fully and completely, we have to look at it from the time of execution. Based on Mr. Denning's declaration, it's actually quite easy to figure out what the time of... That's not what the earlier opinion says. It says it has to be in the applet before it's transmitted. In this case, the functionality and the data are both in the applet before it's transmitted. So if you look at the applet... Are you talking about the Group B applets? We're discussing the Group B applets. They have all the data and functionality in the applet before it gets transmitted? They have it in the applet. Before it's transmitted? Well, let's look at the Group A applets. No. Does it have it before it's transmitted? It meets... So how the Group B applets work is this. Just answer the question. Does it have it in it before it's transmitted? It has the required functionality and data in the applet to the extent that the Group A applets did before it's transmitted. So in the case of the Group A applets, the applets would rely on resources that were resident in the browser's memory already. Am I wrong in understanding how the Group B applets work? My understanding is the Group B applets get sent over to the client. And then after they get sent over to the client, there's some kind of resource that next gets sent over to the client. And then by the time it's time for the applet to execute on the client, it has the resource available at the client site to use to execute the applet. But to be clear, it is using a resource that is outside of the applet, that's not part of the applet, and wasn't sent to the client until after the applet gets sent to the client. What part of what I just said is not right? So I think that we're having a slight terminology issue. What's initially sent to the client is the whole HTML file, which can contain multiple applets. And it's absolutely correct that those applets will rely on resources. In the case of the Group A applets, they're already resident on the browser's memory. In the case of the Group B applets, those resources are downloaded prior to the applet's execution. But when this court asked whether the applet itself... The resources can come from the server in the case of the Group B applets. And which comes first, the HTML document to the client or the resources? The HTML document comes to the client first. And then in parsing the HTML document, those resources can be grabbed from the server. But then the web browser continues to parse the code in the HTML document, at which point it might reach an applet. And so there's a difference between the HTML document and the applet and the resources. And at that point, once everything's loaded into memory, the browser will move into an asynchronous mode of execution where it will execute applets in response to events, for example, a mouse button click or a keyboard click. And at the time of execution,  That's not the question on the claim construction. The district court here said Parole admits that the Group B applets rely on references that are transmitted separately from the web page containing the applet code. This is on A11. And once you concede that, you're outside the claim construction, right? That's not correct, Your Honor, because if we... Which part is not correct? That it doesn't meet the claim construction. And here's why. Earlier... You did admit this, what I read, right? That is absolutely correct. But if we read the claim construction, an executable applet is simply program code that can be used by a client device. The code identified by Mr. Denning in this case, I don't think anyone contests, is program code that can be used by a client device. And it has to be executable, meaning capable of being executed, that is capable of being put into effect and carried out fully and completely. Maybe we have some kind of misunderstanding on what is the claim construction that the 2013 Federal Circuit Opinion announced. I mean, I'm looking at Pinpoint 968, where it says, we construe the asserted claims of the 111 patent to require that the applet be executable or operable when it is generated. And before it is first transmitted to the client. Which means it must include both the particularized data and the functionality. That's my understanding of this court's conception of the claims of the 111 patent. You are expressing some other conception, and where is that in this opinion? Well, the language I have is directly from the opinion. It's on, I believe it's on page, Penn site 958, and maybe that should say 968. And it's where this court explains that the applet is executable, i.e., it's on 967. The applet is executable, i.e., capable of being executed and carried out fully and completely. The applet is then transferred to the client device. And so if we're asking whether the applet is executable, that is, whether it is capable of being carried out fully and completely, well, under the circumstances I just described, once the applet is resident in the browser's memory, it is capable of being carried out fully and completely. Once it is resident, you say? Once the applet is executed. Well, but isn't that tautological? I mean, it's capable of being executed once it's all set to be executed. That's the way it works. But that doesn't mean that it's capable of being executed before it's transmitted, which, as I understand it, is the construction that was previously given. Before it's transmitted, as I understand it, there's a hole in the applet. Which hole is later filled in one of two ways, depending on whether it's a group A or group B. But if it's group B, that hole is filled by a transmission that initially comes from the server and then is passed along to the applet. Isn't that correct? I wouldn't describe either group A or group B as having a hole when compared to the applet. Well, group B, let's just talk about group B then. Wouldn't you describe group B as having a link in which the applet, the portion that executes the function of the applet, has to go outside the confines of the applet and find that functionality? The applet, the webpage has a link. The applet does not have a link. So in the prior appeal, there was actually a call every single time the applet was called that initiated a call across the network to get the product data. So, for example, if you clicked on a different, I think it was clothing, if you picked on a different item of clothing, it would actually reach across the network, get the data for that clothing, and come back. And every time you clicked or selected a different piece of clothing, it would do that. In this case, that doesn't happen. All of the data and the functionality is transmitted for the applet and is available to the applet prior to execution. But it's not in the applet. Again, I think that we are having, I don't want to use the word tautological, but when we're asking whether it meets the claim construction, we simply have to apply the, I mean, it's a little bit definitional. And so when we're asking whether what's been identified as the applet is program code that is capable of being executed, well, in this case it is. As the district court has recognized, a web page can contain, yes, Your Honor? No, I'm just, you're well into your rebuttal time. You can use it up. Well, briefly, before I pass the floor, I would also like to briefly address the cross-appellant's motion for attorney's fees and point out that Parallel contends that the key issue in this case is. I think that's not for the opening argument. Why don't you save that? Yes, Your Honor. Just a quick question. Are there any pending, are there other pending lawsuits with the 111 patent? There are not. Okay. We'll give you two minutes for the rebuttal. Mr. Conner. May it please the Court. I believe the panel's understanding of the prior claim construction and the prior appellate opinion, as well as the technology that's at issue here, is correct. I do want to read one thing from the prior opinion that I think has particular effect here, and this is this quote. Parallel conflates two. I'm at pen site 970, Your Honor. Parallel conflates two very different concepts. One, the generation of the appellate at the server and its transmission to the client. And two, the operation of the appellate after it has been fully transferred to the client. Claim 1 and 17 deal with the former. And I believe what was going on in the prior appeal is the same issue here, which is Parallel is conflating how you construe the claim. Do you do it at the server or at the client? Do you look at what happens at the server or do you look at what happens at the client? That issue was resolved in the prior appeal, yet here we are arguing it again. Now, the record is undisputed, as I believe you recognize, that the appellates all work in a way in which they're not complete when they are sent from the server. The client must still go back to the server to get something that the appellate needs to be executable, and their expert admitted this, and it's true for each of the appellates. I want to call out Kayak in particular because the appellant raised it. But as you saw in that case, in that situation, they initially alleged that the appellate started at a particular line of code, recognized that somewhere within that line of code they identified, there was an explicit reference that they couldn't try to argue around, an explicit reference to go get more code. So they moved that line of code later in the case to something beyond that reference, and that way they could say, well, it's not explicitly in there, and therefore the appellate is complete. But still, in the case of Kayak, their expert admitted that line 134, which is where they moved, the new position they moved to, in deposition, question, in order to get to line 134 and execute those particular lines of code after line 134, the web browser necessarily has already attempted to execute line 110, right? Yes, and line 10 is that explicit reference. That's at appendix 3, 3, 2, 3. So in each of the cases for all the defendants, even Kayak, which is the exception they want to make, it's true that the appellates all are not complete and not finalized once they left the server. What they're trying to do here is overbroaden the interpretation of the claim to something that's so broad it actually captures the prior art. The criticized prior art in the patent is Java appellates, that the first thing they would do when they're transmitted from the server was go back over the network, conduct additional transmissions to get all the information that they needed. That's true here, too. Now, the technology they accused is not a good fit because their expert admits that it's, quote, vastly different. It's something that there is no equivalent packaging mechanism with HTML and JavaScript in order to achieve what the patent is describing. JavaScript and HTML are not described as the mechanism for generating these appellates in the patent, yet that's what they're accusing. So they're trying to capture what's essentially a prior art, and they do that as it's court-recognized in the prior appeal in order to be able to sue a lot of defendants. Now, I'd like to turn to our... Let me ask you one more question on that score. Yes. The difference between Group A and Group B, as I understand it, and correct me if I'm wrong, because I may be, is that with Group B, there's a link within the confines of the applet, and I understand there's a dispute as to what the confines of the applet are, but that there is a link from which the applet will go not back to the server, but within the confines of the client will find the necessary information which has been separately transmitted. That's, as I understand it, Group B. Group A, if I understand it, is there is no such link within the four corners of the applet that goes back to find that data. Is that accurate with respect to either or both? Slightly. Within the box that they've drawn for what they call an applet, which is a subset of the full HTML document that sits down, in Group B, there is no explicit link as well in there. However, there is a reference of code that's going to rely on additional code, and the link is found elsewhere. Well, when I say link, that's a misnomer. I guess what I meant is when the computer gets to that point in the applet that it needs additional code, then it goes outside the confines of the applet to get that code. Is that what happens with Group B, or is that an oversimplification? Technically, it's an oversimplification. Technically, with Group B, there's an explicit requirement within the code for other code that's not there. Okay. That's what I understood. Okay. Keep going. If you were to start executing that code, as their expert admitted, and you haven't gone to go get that external reference, it wouldn't work. Right. The expert admits it's not executable. The external reference is resident on the client, but it's not included in the applet, as I understand it. Not at the time of transmission, Your Honor. No, not at the time of transmission, but at the time of parsing. So at the time of parsing, it has been transmitted, the necessary functionality has been transmitted, before you get to the applet. Let me give you the full chronology. All right. So the HTML is sent down from the server. The client begins parsing the HTML line by line from top to bottom. It'll come across links in that HTML. Every link, it'll go over the server, get that resource. So at some point, one of those links is the code that this applet is going to need. Okay. It'll go get it, bring it to the client. So when it starts executing. It's sitting on the client when the parsing gets to the applet. So by the time it reaches the applet, it will be sitting on the client.  But you can't get to that portion of the applet without having followed those links. Understood. But one way of conceptualizing this, and I guess the way that Judge Davis did, but the distinction that he drew between B and A, which you disagree with, as I understand it. But he said, well, Group A, you don't have to rely on the transmission that occurred earlier, as I understand it. What you've got is an applet which does not need that additional transmitted material. Is that correct? So that's an accurate assessment of how Judge Davis saw it. Because in no situation, Group A or Group B, is that applet going to be able to be executed by the client without executing all the links before. But isn't that just because you, as a matter of computer logic, you start at the beginning and you do whatever the instructions are that are given to you until you get to the applet. And one of those instructions is to pick up this functionality. That's right. And I don't think that issue is actually going to be in dispute here. That's a very good point. I think it's something that we do agree with, but it's not necessary to affirm summary judgment. Okay, I understand that. Group A is out of the case, as I understand it. There are no remaining Group A defendants, correct? So we disagree, to be fair, we disagree on whether Kayak is Group A or B. They initially said it was Group A. I understand, but accepting your argument that Kayak is properly classified. Accepting your argument, we're only concerned with Group B. All right, thank you. Does their attorney's fees position depend on our agreeing that their infringement position is objectively unreasonable? No, Your Honor. It does not depend on it being objectively unreasonable. As in, is there a separate finding that is objectively unreasonable? And the reason is that Octane Fitness, two reasons. Octane Fitness says it's the totality of the circumstances. Is it either objectively unreasonable, or is the litigation misconduct? Okay, so what's the litigation misconduct? So here the litigation misconduct is that their plaintiff has admitted, which is unusual and unlike other cases of this kind, admitted that they had a strategy to sue as many defendants as possible. This court acknowledges that their theory they chose was a broad one that allowed it to do that. Sue as many defendants as possible with the strategy of structuring settlements that encouraged early settlements well below the cost of defense, and they said below the cost to get to markment or trial. Well, what's the matter with that as long as the claims are meritorious? Well, if the claims are meritorious, then we wouldn't be here. I mean, if they're not objectively unreasonable. Strong but not losing. Strong but unsuccessful. And I think you have to look at the big picture to answer that question. It may be the case that out of 100 defendants, one of those claims against that one out of 100 defendants is a shade above objectively unreasonable, just by chance. And so do you want to be able to tell that defendant that there's a risk that you won't be able to take the burden of stopping this abusive litigation because there's a chance that the court will find your claims very weak, but just not objectively unreasonable. So here, octane thickness allows us to say, well, we don't like your strategy and we think that it warrants fees. But you don't have to go so further to say it's also an objectively unreasonable merits case. I'm having trouble following that. If the claims have merit but are unsuccessful, what is the matter with suing a lot of people and settling for less than the cost of litigation? Well, it's up to the district court to decide how meritorious, how much merit they have. As long as you're losing party, so there will be a lack of some merit. As long as you're losing party and your strategy is improper, then that can be grounds for the district court to decide, this case is one where we need to deter the conduct that they had. I may not have a full record to investigate the full merits of this case, but I can tell you it's weak. And I don't like the strategy and I'm going to deter it. I don't have to go through a full mini trial to establish this is definitely objectively unreasonable on a full record. In this case, we didn't have a full record. And I think you alluded to this earlier. Are you saying that if you have 20 defendants and the case is, let's say, extremely weak as to 19 of them, but you happen to be the defendant, as to which the case is actually quite presentable, a perfectly presentable case that just happens to be lost, let's say, after a jury trial and appeal and everything in which everybody regards that as close question, that you can get fees not because it was unreasonable to pursue you in this case, but because the plaintiffs improperly pursued the other 19? Right. And that may be because you don't know at the time of making the decision to defend the case, whether you're going to be so successful that your case is the one that's going to be up. So are you saying that in that case you would get fees? In that case, you would get the fees, which is not a reward. It's simply a reimbursement for defending the case. And this is Supreme Court's precedence for this. And in the John Wiley case in the copyright context, it acknowledges that you can – there may be a good case which a district court who's overseeing the case can decide, is the defendant one, the totality of the circumstances, when you consider how the plaintiff is out there suing people, warrants this defendant to be reimbursed for their fees, even though in this case I may not have a full record, I may not be able to feel comfortable saying in every situation this is objectively unreasonable, but I can tell you it's a weak case. In this case, Judge Davis said it was without merit. I don't see that Octane says that you can award fees for a weak case. It's very careful to say that the fact that you lose isn't sufficient. That's true, but when you look at the totality of the circumstances, when the plaintiff loses, but the totality of the circumstances says they are pursuing an improper case that abuses the court system by suing a lot of defendants on a weak case with the express goal of settling as many as they can before they ultimately lose their merits. Are you challenging the district court's finding that the infringement theories here were not objectively unreasonable? So that was a successor judge that ultimately ruled on the exceptional case, and we are challenging that finding because it contradicts without any reasoning, so it's arbitrary, contradicts without any reasoning Judge Davis' prior expressions and rulings on this case. Well, Judge Davis said that the claim was, quote, without merit, something we say all the time when we decide, even in a close case, that one side loses. Without merit doesn't mean frivolous, doesn't mean hopeless. And Judge Davis wasn't asked. It's a common expression, and there was nothing. I mean, Judge Davis spent a lot of time with this case and did some fine-tuning in the course of the case, including dealing with the Group A, Group B distinction, and nothing about what he was doing indicated to me that he regarded this case as being frivolous. Well, at the very outset, he expressed extreme concern about it being frivolous. He said, quote, I'm concerned about this being a shakedown cost of defense type litigation. Whoa, whoa. Shakedown, the quote about shakedown, he followed by saying, I'm not saying that is true in this case. He was saying, I'm concerned about the risk of this kind of suing as being a shakedown. But he specifically said, if I recall the transcript, that this is not saying that that is true in this case. Am I wrong? You're right that he said that, but that was early in the case, before he got a chance to even look at the merits, and he wasn't asked to determine whether this was a shakedown. Yeah, but you use the word shakedown several times in your brief with the suggestion that Judge Davis was saying that this was a shakedown, without adding the additional line in which he says, I'm not saying that's true in this case. To be clear, I wasn't representing he found it to be a shakedown. That's what I understood you to be arguing, but okay. I apologize, Your Honor. What he was saying was, I'm worried about this being a shakedown, and so what we knew is that he is the jurist. How does that help you, that he was worried about it? What's the finding that Judge Davis made that helps you now? Because the judge, the successor that ruled in the case, answers the question, what finding did Judge Davis make that helps you? In the order, after he held this hearing with all the defendants, he said, quote, the plaintiff's strategy in this case makes it unlike the typical patent case. That means it stands apart from others because it, quote, sued over 100 defendants with the goal of early resolution of the disputes through settlement in a range that essentially amounted to litigation costs. That's at 3647. So he made an express finding on the record that this case was unlike other. That doesn't even dispute it, but the question is whether that's sufficient to get attorneys. Well, it's sufficient for the successor judge who made the ruling, which paid no attention to it in his ruling. So when you look at the totality of the record of what Judge Davis said, and the successor judge made findings that were directly contradictory to what he said, you have to look at his opinion as arbitrary, that he didn't look at the record. The finding of Judge Schrader is contrary to a finding of Judge Davis. What did Judge Schrader say that you can point to something and say that's squarely contrary to something said by Judge Davis? Certainly. You mentioned the without merit thing, and I think that doesn't get you anywhere as far as I'm concerned. It just says that you lose. One good example is Judge Davis said that the expert that was shifting on Kayak had no justification. On another expert, this court, too, said that their expert was, quote, Ipsy Dixit in the merits of the opinions that mattered for those experts. Judge Schrader said, quote, this was extensive analysis and expert opinion. That is directly contradictory and shows that he actually did not consider the Judge Schrader said that on 3-4-7, 3-4-1-6. Okay. I think we're out of time. Thank you, Mr. Conner. Thank you. Mr. Craddock, you have two minutes. The single biggest question on Cross Appeal is what is the appropriate standard of review and can cross appellants win under an abusive discretion standard of review? As Mr. Conrad just noted, it is up to the district court to decide. In this case, the district court did decide, and the district court's decision should be given deference in the abusive discretion standard of review. It is explained in Highmark, Inc., versus All Care Health Management Systems, Inc., 134, Supreme Court, 1744. It's 1747-48. The standard of review for reviewing a trial court's ruling on all aspects of a motion for fees is abusive discretion. What do you say about Mr. Conrad's successor judge argument? You understand what I'm saying? I understand what you're saying, Your Honor. Judge Schrader actually, cross appellants are heavily relying on these statements made in March of 2011 before there was a markment, before there was a first summary judgment, before there was a second summary judgment. Judge Davis had the case for about a year at that point. Judge Schrader had the case for over a year before he ultimately made his ruling on the motion for attorney's fees. If we're going to ask how long does a court have to have a case before it's entitled to deference, I'm not sure where you draw that line. I'm really not, without setting up some different standard of review. I understand that cross appellants are advocating for that, but I'm not sure how you set up a bright line rule. How long does a judge have to be with the case before that judge is entitled to deference? Which is why I believe that, you know, we've simplified that. I mean, the Supreme Court has simplified that. They say there is one standard of review. We're not going to do a tripartite issue where we review certain parts of it de novo, certain parts for clear error, and certain parts for abuse of discretion. And that's because these things are fact specific. How many defenses is too many? Where do you draw the line? What settlement amounts are reasonable? Where do you draw the line? What is a reasonable cost of defense? Where do you draw the line? That's why it's not a matter of law. That's why it is an exercise of discretion, and the law is clear that it is the trial court's exercise of discretion. Okay. Thank you, Mr. Pratt, for your time. Thank both counsel. The case is submitted.